**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| HERMAN PEREZ, and DIANNA PEREZ | : | |
| | : | |
| Plaintiffs, | : | Civ. No. 04-452 (GEB) |
| | : | |
| v. | : | **MEMORANDUM OPINION** |
| | : | |
| NEW JERSEY TRANSIT CORPORATION, | : | |
| NEW JERSEY TRANSIT POLICE | : | |
| DEPARTMENT, JOSEPH C. BOBER, | : | |
| JOHN RICCIARDI AND RICHARD | : | |
| GOLDSTEIN, | : | |
| Defendants. | : | |
| | : | |
| | : | |

**BROWN, Chief Judge**

This matter comes before the Court upon defendants New Jersey Transit Corporation, New Jersey Transit Police Department ("NJTPD"), Joseph C. Bober, John Ricciardi and Richard Goldstein's (collectively "Defendants") Motion for Summary Judgment.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.  The Court, having considered the parties' submissions and decided the matter without oral argument pursuant to Federal Rules of Civil Procedure Rule 78, and for the reasons set forth below, will grant Defendants' Motion.

## I.    BACKGROUND

The NJTPD hired Herman Perez as a police officer on January 7, 2002.  (Defendants'

Statement of Facts ¶ 1).  His employment status was probationary.  *Id.*  Prior to that, Perez

worked as an officer at the Hudson County Sheriff's Office ("HCSO").  *Id.* at ¶ 3.  On January 3,

2003, the NJTPD terminated Perez; Defendants maintain that Perez was terminated because of

the civilian complaints filed against him and his failure to co-operate with the Internal Affairs

investigation of his off-duty conduct.  Perez alleges that he was terminated because of his

association with the Hispanic Law Enforcement Association ("HLEA") and other protected

speech.

The complaints against Perez addressed two general concerns: his behavior toward his

neighbors and unauthorized issuance of warning summonses to cars double parked in his

neighborhood.  Perez's neighbor, Susan Rivera, lodged the first complaint against Perez that

prompted the Internal Affairs Department to initiate an investigation in November of 2002.  *Id.* at

¶ 4.  In a tape-recorded statement, Rivera reported the following complaints: (I) Perez tried to

intimidate the neighborhood children from playing in their street by showing them his badge,

cursing at them and telling them to get out of the way; (ii) Perez went over to the construction

workers working at her home, showed them his badge and threatened that they better have a

permit or he would come back and issue a summons; (iii) on at least three occasions, Perez rode

his bike or played with his kids outside in plain clothes with his gun exposed; (iv) on at least ten

occasions, Perez allowed his children to play with the lights and siren on his marked NJTPD car;

and (v) Perez was aggressive, combative and harsh toward his neighbors;  *Id.* at ¶¶ 5-13.

Perez admits that Rivera lodged these complaints but denies most of her allegations.

(Plaintiff's Counter-Statement of Facts ¶¶ 6-13).  First, Perez denies intimidating the

neighborhood children or cursing at them.  *Id.* at 12.  Second, Perez alleges that he went to

Rivera's house at the time the construction workers were there to express concern that there was a lot of dangerous debris in his neighborhood, which had allegedly injured his minor child. *Id.* at ¶¶ 6-13. Perez alleges that he did not tell the construction workers that he was a police officer or threaten them in any other way. He addressed them as a concerned neighbor. Perez alleges that he asked the Internal Affairs officers investigating him, defendants Ricciardi and Goldstein, to get in touch with the construction workers to verify his story, but the defendants refused to do so. Third, Perez admits that he spent time in the neighborhood with his gun exposed, but alleges that he was instructed by NJTPD policy to always wear his badge and gun off-duty. *Id.* Perez did not address Rivera's fourth allegation. *Id.* at ¶ 10. Perez denies Rivera's fifth allegation.

Perez alleges that seven of his neighbors contacted Internal Affairs to speak out on his behalf, but Ricciardi and Goldstein only spoke to one of them. *Id.* at ¶¶ 6-13. Perez's neighbor Carmen Tirella has signed a certification stating that Perez is a good friend and a helpful neighbor and that he is not the type of person who "flies off the handle" or acts irrationally. *Id.* Tirella's certification also states that after the other neighbors lodged complaints against Perez, he contacted Internal Affairs to express his opinions regarding Perez's behavior and share information he felt could be helpful to the plaintiff. *Id.* Tirella alleges that he spoke to Goldstein who led him to believe that he had no interest in hearing what he had to say. *Id.*

Perez's neighbors also complained to the NJTPD that Perez issued warning summonses to cars double parked on his street with the summonses he retained from his previous employment at the HCSO. On November 14, 2002, Rivera provided Internal Affairs with a copy of a "warning" summons with the control number and the police department identification obliterated and the words, "warning do not double park next time the ticket will be filled out

final warning." *Id.* at ¶ 14.  On November 26, 2002, Andre Narvaez, a friend of Rivera's, gave a tape recorded statement to Internal Affairs, complaining that while visiting the Riveras on October 26, 2002, he found a HCSO summons on his windshield.  *Id.* at ¶¶ 15-17.  Narvaez alleged that the summons had the words "Warning, Do not double park.  Next time the ticket will be filled out.  Final Warning" written on it.  *Id.* at ¶ 18.  Another neighbor, Steve Rajaram, also turned over a HCSO warning summons that he received for double parking in his neighborhood in approximately June of 2002.  *Id.* at ¶¶ 29-32.  The identification number on that summons was 7493.  *Id.* at ¶ 29.  The HCSO confirmed that they issued summons number 7493 to Perez while he was in their employ.  *Id.* at ¶ 32.  Internal Affairs sent Rivera's and Rajaram's summonses to a forensic document examiner, who opined that the handwriting on both was that of Perez.  *Id.* at ¶ 40.

Perez denies issuing any HCSO summonses during his employment at the NJTPD. (Plaintiff's Counter-Statement of Facts ¶ 20).  Perez does however admit that he did not turn over all of his ticket books when he resigned from the HCSO.  *Id.*  When asked how his neighbor received a warning summons written out on the ticket that the HCSO issued to him, he said that he could have dropped the ticket book or it could have fallen out of his car.  *Id.*

Defendants allege that they instructed Perez several times not to harass his neighbors or issue unauthorized summonses.  (Defendants' Statement of Facts ¶ 28, 38).  Instead of simply obeying, Perez was defiant and argumentative.  *Id.*  Defendants provided an excerpt from Perez's second Internal Affairs interview, in which Goldstein advised Perez to knock off the problematic behavior and Perez replied:

Now, you know what, Mr. Goldstein?  Let me tell you something.

4

> You say oh people, you're out there watching these people vigilantly
> with the double parking.  It's not that I'm out there watching them
> double-parking.  I mean, and I'm, and I'm waiting for it to happen.
> Okay?  A kid crosses the street.  The car's double parked there.
> How's Transit gonna look now?  Oh, the kid just got hit by a car.
> He's dead. . . . [*Id.* at ¶ 38].

Perez alleges that he was not argumentative during his interviews.  Rather, he explains that he

was attempting to determine the bounds of his responsibilities as a NJTPD officer.  (Plaintiff's

Counter-Statement of Facts ¶ 28).

On December 9, 2002, the NJTPD issued a Notice to Perez that he was being charged

with conduct unbecoming of an officer and failure to truthfully cooperate with his investigation.

(Defendants' Statement of Facts ¶ 41).  On December 20, 2002, Goldstein issued a report of the

investigation, concluding that Perez harassed and intimidated his neighbors, wore his weapon

while in plain clothes and issued warning summonses to his neighbors using the HCSO

summonses.  *Id.* at ¶ 43.  The report concluded that Perez had lied to investigators when he

denied issuing the summonses and that he was defiant and arrogant during the three interviews

conducted by Internal Affairs.  *Id.*

The police chief, defendant Bober, testified that he decided to terminate Perez on or

around January 3, 2003, based on Goldstein's report, Perez's refusal to "knock off" the

problematic behavior and Perez's repeated lying about issuing the warning summonses.  *Id.*

Perez alleges that Bober was really motivated by discrimination and offers the following as

proof: (I) Perez alleges that prior to his termination, Bober made a comment about "spics and

niggers" in his presence,  (Plaintiffs' Counter-Statement of Facts ¶¶ 51-52); (ii) he was

terminated shortly after conducting heavy recruiting for the HLEA, *id.* ¶¶ 44-45; and (iii)  when

Bober terminated him, he stated, "No FOP, no PBA, and no Hispanic organization is going to stand up to me," and that Perez would be made an example, *id.* at ¶¶ 51-52; (Defendants' Statement of Facts ¶ 53).

Perez also alleges that Ricciardi and Goldstein conducted the investigation into his conduct in a biased manner because their main goal was to find sufficient evidence to justify his termination. *Id.* at ¶¶ 28, 44-45.  Specifically, Perez alleges that during the interviews, Ricciardi and Goldstein paused the tape-recorder several times to threaten him off the record. *Id.* at ¶ 27. The interviews allegedly lasted two to three hours, which, according to Perez, is unheard of for an off-duty neighborhood squabble. *Id.* at ¶ 28.  Bober stated during his deposition that he did not recall any other probationary police officer getting terminated over a civilian complaint or a neighborhood dispute. *Id.* at ¶¶ 34-46.  Ricciardi testified that he had never tried to obtain handwriting exemplars or a forensic evaluation of documents in any other investigation. *Id.*

Defendants deny that discrimination played a role in Perez's termination.  They note the following facts: (I) prior to filing the present lawsuit, Perez never complained about discrimination to the Equal Employment Opportunity Office for New Jersey Transit ("NJT EEOO"), (Defendants' Statement of Facts ¶ 50); (ii) Perez admits that Ricciardi and Goldstein never mentioned the HLEA to him or made any directly discriminatory comments, *id.* at ¶ 55; (iii) Perez admits that prior to his termination, Bober never said anything to him about the HLEA, *id.* at ¶ 73; (iv) prior to his termination, no one at NJTPD tried to stop him from recruiting for the HLEA, *id.* at ¶ 57; (v) neither Ricciardi nor Goldstein ever said anything to Perez about his race or national origin, *id.* at ¶ 60; (vi) during the investigation, Perez did not complaint that he was being subjected to disparate treatment, *id.* at ¶ 61; (vii) prior to the

investigation, no one at NJTPD had ever reprimanded Perez or written him up, *id.* at ¶ 62; (viii) Ricciardi and Goldstein allowed Perez to present witnesses by giving him their cards and telling him to give these to any neighbor who wished to call in and give information, and the investigation report contains recitals of telephone calls from four of Perez's witnesses, *id.* at ¶¶ 69-70; (ix) there were other Hispanic officers who started their probationary period around the same time as Perez, and they are now permanent officers, *id.* at ¶ 77; (x) prior to the investigation, Perez had no problems working at NJTPD and was not treated differently from anybody else, *id.* at ¶ 78.

Perez attempted to file a grievance concerning his termination pursuant to the collective bargaining agreement covering NJTPD officers.  (Defendants' Brief at 1).  The grievance received no response.  *Id.*  Thereafter, Perez filed a request for arbitration with the New Jersey Public Employment Relations Commission ("PERC").  *Id.*  On September 29, 2003, PERC issued an award, concluding that Perez was a probationary employee on the date of his termination, and, as such, was subject to discharge with or without cause and for any reason without recourse to the grievance or arbitration provisions of the collective bargaining agreement.  *Id.* at 1-2.  PERC concluded that the grievance procedures were reserved for permanent employees.  *See id.* at 2.

Perez appealed PERC's decision to the New Jersey Superior Court, Law Division, Bergen County, which ruled on September 10, 2004, that as a probationary employee, Perez had no recourse to the grievance procedures of the collective bargaining agreement.  *Id.*  On September 2, 2003, Perez filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming national origin and age discrimination, as well as retaliation.

*See* Charge of Discrimination, attached as exhibit 14 to Affidavit of Craig J Smith.   Other than

Perez's claim that his employer was aware of his membership with the HLEA, the Charge

contains no additional allegations that Defendants made discriminatory statements at or around

him, interfered with his associational rights, made comments about the HLEA or took actions to

thwart his involvement in the HLEA prior to his termination.  *Id.*  Rather, Perez alleged the

following: (I) he was subject to disparate treatment because other non-Hispanic probationary

officers who engaged in criminal acts during their probationary period received a lesser

punishment than he did; and (ii) Defendants terminated him because Ricciardi informed Bober

that Perez was going to the New Jersey Attorney General's Office to complain that Internal

Affairs violated the Attorney General's guidelines while conducting its investigations.  *Id.*

On November 3, 2003, the EEOC dismissed Perez's Charge and sent him a Notice of

Right to Sue.  *See* exhibit 15 to Affidavit of Craig J Smith.   On February 3, 2004, Plaintiffs filed

the present action.  (Defendants' Brief at 3).  The Complaint contains twelve counts:

Count One: common law negligent infliction of emotional distress

Count Two: First Amendment freedom of speech claim

Count Three: 42 U.S.C. § 1983 claim based on due process violations during Perez's

investigation and termination

Count Four: 42 U.S.C. § 1985(1), (2) and (3) claims of conspiracy

Count Five: State law freedom of speech claim

Count Six: 42 U.S.C. § 1981 claim based on violation of Perez's right to enjoy the

contractual benefits of his employment

Count Seven: Title VII claim based national origin discrimination and hostile work

8

environment

Count Eight: Title VII retaliation

Count Nine: New Jersey Law Against Discrimination ("NJLAD") claim based on

national origin discrimination and hostile work environment

Count Ten: NJLAD claim of aiding and abetting in allegedly unlawful termination

Count Eleven: loss of consortium claim by Diana Perez

Count Twelve: common law civil conspiracy claim to deprive Perez of his employment

rights and civil rights and to harass him

On April 15, 2007, Defendants filed the pending Motion for Summary Judgment.  Briefing on

the matter now complete, the Court will address the pending motion.


## I.    DISCUSSION

### A.    Standard of Review

In deciding a motion for summary judgment, a court should grant the motion if "there is

no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).  The threshold

inquiry is whether "there are any genuine factual issues that properly can be resolved only by a

finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In deciding whether triable issues of fact exist,

the court must view the underlying facts and draw all reasonable inferences in favor of the non-

moving party.  *See Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987).  In arguing

against a motion for summary judgment, "an adverse party may not rest upon the mere

allegations or denials of the adverse party's pleading, but the adverse party's response . . . must

set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

### B.    Collateral Estoppel

#### 1.    The Parties' Arguments

Defendants argue that the doctrine of collateral estoppel mandates the dismissal of Counts

Two, Three, Five and Six because these allege issues that were previously litigated and decided

by PERC and the Superior Court.  Namely, the Counts allege that Perez had a property interest in

his employment, that he was denied due process during the Internal Affairs investigation and that

he was wrongly denied access to the collective bargaining agreement's grievance procedures.

(Defendants' Brief at 25).

Plaintiffs do not dispute that collateral estoppel applies to the aforementioned issues.

(Plaintiffs' Brief at 17).  Plaintiffs argue that collateral estoppel does not apply to the main issue

in dispute--whether Perez was discharged based on discriminatory reasons–because neither

PERC nor the Superior Court addressed this issue.  *Id.*

#### 2.    Applicable Law

Collateral estoppel prevents a party from relitigating an issue that was actually litigated

and decided in a prior action.  *Haring v. Prosise*, 462 U.S. 306, 314-15 (1983).  The Third

Circuit Court of Appeals has articulated a four-prong standard that must be met before a court

can apply this doctrine: "'(1) the identical issue was previously adjudicated; (2) the issue was

actually litigated; (3) the pervious determination was necessary to the decision; and (4) the party

being precluded from relititgating the issue was fully represented in the prior action.'" *Jean*

*Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) (quoting

*Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 209 (3d Cir. 2001)).

### 3.      Collateral Estoppel Applies to Perez's Contentions that he Had a Property Interest in his Employment or that he was Denied Due Process

The PERC and the Superior Court had already decided the property interest and due

process issues.  Plaintiffs do not dispute that the parties had a full and fair opportunity to litigate

these. Both the PERC and the Superior Court actions centered around these issues; therefore,

these issues were essential to both judgments.  The judgments were valid, final and on the merits.

Finally, Perez was a party to both prior actions, and Plaintiffs do not argue that he was

inadequately represented.  Therefore, Plaintiffs are estopped from relitigating these issues in the

present action.  The issues left for the Court to determine are whether Defendants discriminated

or retaliated against Perez in violation of his State and federal rights.

### C.      First Amendment Claims

#### 1.      The Parties' Arguments

Defendants argue that Counts Two, Three, Four, Five, Seven, Eight and Twelve, which

allege that Perez was terminated either to silence his speech regarding the HLEA, to stop his

association with the HLEA or to retaliate against him for his support of other minority officers,

should be dismissed because Perez has not produced any admissible evidence to support these.

11

(Defendants' Brief at 27-29).  According to Defendants, Perez has not produced any evidence showing that Defendants interfered with his association with the HLEA.  *Id.*  Defendants also argue that Perez did not engage in speech regarding matters of public concern.  *Id.* at 28-29. Rather, Perez's only complaints were to his own Sergeants about the Internal Affairs investigation being conducted on him.  *Id.*

Plaintiffs argue that Perez did engage in speech on matters of public concern.  (Plaintiffs' Brief at 22).  As evidence, Plaintiffs proffer Perez's deposition testimony, wherein he alleges that he complained about the violation of minority officers' rights under the New Jersey Attorney General Guidelines on Internal Affairs Policies and Procedures ("P & P Manual") and threatened to report these violations to the Attorney General's Office.  *Id.* at 19-22; (Plaintiffs' Counter-Statement of Facts ¶ 56).  As evidence of causation between Perez's speech and his termination, Plaintiffs proffer the statement Bober made while terminating Perez regarding no FOP, PBA or Hispanic organization standing up to him.  (Plaintiffs' Brief at 26-27).  Alternatively, Plaintiffs' argue that the causation can be inferred from the proximity of time between Perez's engagement in protected activity and his termination.  *Id.* at 26-27.


## 2.      Applicable Law

"A public employee has a constitutional right to speak on matters of public concern without fear of retaliation."  *Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir. 2001).  Public employers cannot punish their employees because they disapprove of the content of their speech. *Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987).  Courts employ a three-prong test to evaluate whether a public employee was retaliated against for engaging in protected speech:

> First, plaintiff must establish the activity in question was protected.
> For this purpose, the speech must involve a matter of public concern.
> Once this threshold is met, plaintiff must demonstrate his interest in
> the speech outweighs the state's countervailing interest as an
> employer in promoting the efficiency of the public services it
> provides through its employees. These determinations are questions
> of law for the court.  If these criteria are established, plaintiff must
> then show the protected activity was a substantial or motivating factor
> in the alleged retaliatory action.  Lastly, the public employer can rebut
> the claim by demonstrating "it would have reached the same decision
> . . . even in the absence of the protected conduct." [*Baldassare*, 250
> F.3d at 194-95 (citations omitted) (quoting *Mt. Healthy City Sch.
> Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977))].

Speech involves a matter of public concern when it relates to "any matter of political, social or other concern to the community." *Watters v. City of Philadelphia*, 55 F.3d 886, 892 (3d Cir. 1995).  Courts evaluate the content, form and context of speech to determine whether it meets this standard.  *Connick v. Meyers*, 461 U.S. 138, 147-48 (1983).  Courts have held that speech involves a matter of public concern when it addresses corrupt and unlawful practices by government officials, *O'Donnell v. Yanchulis*, 875 F. 2d 1059, 1061 (3d Cir. 1989), "'actual or potential wrongdoing or breach of public trust' on the part of government officials," *Holder v. City of Allentown*, 987 F.2d 188, 195 (3d Cir. 1993) (quoting *Connick*, 461 U.S. at 148), and union-related matters, *Crane v. Yurick*, 287 F. Supp. 2d 553, 560 (D.N.J. 2003).

Further, the causation between the protected speech and the discriminatory action can be proven through direct or indirect evidence.  That is, causation can sometimes be inferred from the temporal proximity between the employee's speech and the employer's action.  *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003).  However, "'the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred.'"  *Id.* (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003)).  If the

temporal proximity is not sufficiently suggestive, the Third Circuit has required additional proof

of a causal link. *Id.*

### 3.    Plaintiffs' First Amendment Claims are Subject to Dismissal

Plaintiffs have not established a genuine issue of material fact that Defendants interfered

with Perez's association with the HLEA.  Plaintiffs' freedom of association claim rests entirely

on Perez's unsubstantiated assertions.  It is undisputed that Perez never complained about

interference with his freedom of association to the NJT EEOO, to anyone at the NJTPD or in his

EEOC Charge of Discrimination.  It is also undisputed that prior to the investigation, no one at

the NJTPD had ever reprimanded Perez or written him up.  Perez admits that prior to his

termination, no one at NJTPD tried to stop him from recruiting for the HLEA; Goldstein and

Ricciardi never said anything to him about the HLEA and the only comment Bober allegedly

made about the HLEA at the time of Perez's termination was: "No FOP, no PBA, and no

Hispanic organization is going to stand up to me."  Therefore, Perez's freedom of association

claim is subject to dismissal.

Additionally, Plaintiffs have not established a genuine issue of material fact that Perez

engaged in speech on matters of public concern.  Perez has not supported his allegation that he

spoke out about the violation of other minority officers' rights.  Perez was questioned about this

allegation extensively during his deposition.  (Perez Dep. at 112-118).  When asked whom he

spoke out to, Perez only named Sergeant Clark.  (Perez Dep. at 113).  Perez alleged that he told

Sergeant Clark that the P & P Manual was not followed with respect to Officers Mantilla, Otto

and Minelli, and Liutenant Bud Richards.  *Id.* at 114.  When questioned further, Perez revealed

that only one of these men is Hispanic and the rest are Caucasian, contradicting his original

allegations that he complained about the discriminatory treatment of minorities.  *Id.* at 114-15.

Perez's alleged threat to report violations to the Attorney General's Office does not

constitute protected speech on a matter of public concern.  In his deposition, Perez explained that

the "threat" he was referring to was the one he made during his first Internal Affairs interview.

*Id.* at 115-16.  Perez made the "threat" in reply to Ricciardi's instruction to "knock off" the

problem conduct and to have no further contact with Ms. Rivera.  Perez replied: "I wonder what

the Attorney General would say if he knew that we're encouraged to run away or to turn away

from crimes?  I would be interested in knowing what the Attorney General would have to say to

something like that."  *See* Transcript of First Internal Affairs Interview at D250, attached as Ex. 7

to Affidavit of Craig J. Smith.  The Court concludes that this statement does not constitute

protected speech because it is not related to "any matter of political, social or other concern to the

community."  Rather, it is a stunning display of defiance in response to a logical direction from a

superior officer to refrain from direct contact with the civilian who lodged a complaint.

Plaintiffs have not established an genuine issue of material fact that there is a causal link

between Perez's protected speech and his termination.  Perez's only direct evidence consists of

the statement Bober allegedly made during his termination.  This statement does not evidence

retaliation for protected speech.  Rather, it can logically be interpreted to mean that Bober had

determined to terminate Perez and was not willing to change his mind at the behest of any

employee organization.

Plaintiffs have not proffered substantial evidence of indirect causation either.  They have

not specified the exact timing between Perez's protected conduct and his termination, and there is no evidence to indicate that Perez's termination occurred within a short time after his alleged protected activity. Therefore, there is no grounds upon which a reasonable factfinder could conclude that the timing is unduly suggestive. On the contrary, the close proximity of the termination to the conclusion of the investigation and issuance of Goldstein's report is evidence that it was motivated by disciplinary reasons.

Defendants have rebutted Plaintiffs' allegations by proffering evidence that they would have terminated Perez in the absence of his alleged speech. Defendants established that they never reprimanded or disciplined Perez prior to the investigation. The investigation was prompted by numerous civilian complaints that accused Perez, a probationary officer, of serious misconduct, including harassment and unauthorized issuance of warning summonses. Defendants committed significant resources to investigating the complaints. The investigation uncovered that Perez lied about issuing the warning summons and disobeyed numerous orders from his superior officers to cease the problem behavior. It is clear that Defendants had ample grounds on which to base Perez's termination, none of which were related to Perez's speech.


   **D.     Pretext**

        **1.     The Parties' Arguments**

Defendants note that Plaintiffs' infliction of emotional distress (Count One), retaliation (Counts Two, Seven, Eight, Nine and Ten) and conspiracy (Counts Four and Twelve) claims allege that Defendants' stated reason for Perez's termination is a pretext for discrimination. (Defendants' Brief at 30). Defendants argue that these must be dismissed because Plaintiffs

failed to proffer any admissible evidence of pretext.  *Id.* at 30-34.

Plaintiffs argue that they have proffered sufficient evidence to establish pretext. (Plaintiffs' Brief at 32-36).  The evidence includes: (I) comments allegedly made by Bober about "spics and niggers" and comments made by him to Perez at the time of his termination; (ii) Perez appears to be the only probationary employee ever terminated over a civilian complaint; (iii) the way in which Perez's investigation was handled was allegedly contrary to NJTPD's policy of resolving demeanor complaints at the squad level by the officer's supervisor; (iv) the investigation consisted of three interviews that lasted between two to three hours; (v) Goldstein and Ricciardi allegedly failed to take statements from witnesses calling in on Perez's behalf; (vi) Defendants used a forensic expert to test Perez's handwriting but had not retained experts in any other departmental investigation; (vii) Perez alleges that other officers told him they were afraid to join the HLEA because they feared being put on Bober's "hit list"; (viii) ex-Chief of the NJTPD Mary Rabadeau testified that she refused to promote Bober to deputy chief under her regime because she felt he exhibited differential treatment towards minorities; and (ix) Gerard Robson, an officer who was also terminated by the NJTPD, testified that Bober created a retaliatory environment by terminating him for drafting a report that criticized Bober's leadership style.  *Id.*

### 2.    Applicable Law

"Pretext is a 'purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs;' in essence, pretext is a 'cover-up' for a discriminatory purpose." *Bowles v. City of Camden*, 993 F. Supp. 255, 262 (D.N.J. 1998) (quoting *Loeb v. Textron*, 600

F.2d 1003, 1012 (1ˢᵗ Cir. 1979)).  Generally, a plaintiff bears the burden of proving pretext at the third stage of the tripartite burden-shifting framework the Supreme Court developed in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802-07 (1973), to resolve discrimination claims based on indirect or circumstantial evidence, such as the claims at issue in this case.[1]  At the first stage of the *McDonnel Douglas* framework, the plaintiff bears the burden of establishing a *prima facie* discrimination claim.  *Id.* at 802.

If the plaintiff succeeds at creating a presumption of discrimination, the case will enter the second stage of the framework, wherein the burden of production shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory motive for its action.  *Id.*  Because "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff, the defendant is merely required to articulate, not prove, his non-discriminatory motive."  *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  If the defendant does not articulate such a motive, the court must enter a judgment for the plaintiff "because no issue of fact remains in the case."  *Id*. at 254.  However, if the defendant meets its burden, the case will enter the third stage of the framework–the pretext stage.

---

[1]  Direct evidence is evidence that can "prove the existence of a fact . . . without inference or presumption." *See, e.g., Carter v. City of Miami*, 870 F.2d 578, 581-82 (11ᵗʰ Cir. 1989).  Direct evidence may consist of a facially discriminatory oral or written policy, *see, e.g., City of Los Angeles Dep't. Of Water & Power v. Manhart, 435 U.S. 702, 705 (1978)* (holding that policy requireing female employees to make larger contributions to a pernsion fund constitutes direct evidence of discrimination).  It may also consist of an oral or written statement by the defendant or its agent acknowledging that the employment decision was motivated by discrimination.  *Troupe v. May Dep't Stores*, 20 F.3d 734, 736 (7ᵗʰ Cir. 1994).  Direct evidence is rare in employment discrimination cases.  When it is available, courts analyze the plaintiff's claims pursuant to the framework developed in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 273-79 (1989).  Circumstantial evidence, on the other hand, requires the factfinder to infer the existence of a fact from the circumstances described.  Circumstantial evidence may include "suspicious timing, abiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces [that] might imply discrimination."  *Troupe*, 20 F. 3d at 736.

At the pretext stage, the burden of production shifts back to the plaintiff to show that the

defendant's stated motive was a pretext for discrimination.  *Id.* at 807.  A plaintiff can establish

pretext by pointing "to some evidence, direct or circumstantial, from which a factfinder could

reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that

an invidious discriminatory reason was more likely than not a motivating or determinative cause

of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).


### 3.      Plaintiffs' Infliction of Emotional Distress, Retaliation and Conspiracy Claims are Subject to Dismissal for Lack of Evidence of Pretext

The circumstantial evidence Plaintiffs have offered is insufficient to establish a genuine

issue of fact that Defendants' articulated reasons for Perez's termination are a pretext for

discrimination.  Defendants have proffered a non-discriminatory motive for terminating Perez:

Perez was a probationary officer accused of serious misconduct, they believed he was untruthful

during the investigation and he failed to comply with orders from his superior officers to "knock-

off" the problem conduct.  Plaintiffs have not shown that Defendants' stated motive is false or

that they were more likely than not motivated by discrimination.  The fact that Perez's

investigation was handled by Internal Affairs, the length of his interviews, the investigators'

failure to interview every witness who called in on Perez's behalf and the use of a forensic expert

do not suggest that Perez was treated unfairly, in light of the probationary status of his

employment, the seriousness of the complaints filed against him and his failure to cooperate with

the investigators.[2]

Perez's allegation that he heard Bober make a comment about "spics and niggers" is likewise insufficient to establish a genuine issue that Defendants' stated motive is a pretext. Perez has not alleged that this comment was made to him, about him, around the time of his termination or in connection with his termination. Although deplorable, alleged comment was an isolated incident. Perez admits that aside from this comment, no Defendant has ever made a discriminatory remark at him or around him. Offhanded comments and isolated incidents are insufficient to sustain a claim of discrimination under Title VII and LAD. *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). This is particularly true when the comments are directed not at the plaintiff but at another individual. *Id.* (holding that evidence of isolated racist remarks not directed at plaintiff, graffiti and flyers was insufficient to establish discrimination).

Perez's allegation that other officers expressed to him their fear of joining the HLEA is inadmissible hearsay. Also, Rabadeau and Robson's allegations are insufficient to establish a genuine issue of fact regarding the presence of a custom or policy of discrimination or retaliation. To establish the presence of a custom or policy of discrimination, a plaintiff must show "'more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts.'" *United States v. Lansdowne Swim Club*, 894 F.2d 83, 88 (3d Cir. 1990) (quoting *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324 , 336 (1977)). Rather, a plaintiff must show that discrimination

----

[2] Plaintiffs have not provided the Court with a copy of the aforementioned NJTPD policy that Defendants allegedly breached by conducting an investigation instead of handling the complaints against Perez at the squad level. Absent such evidence, the Court will not second-guess NJTPD's authority to conduct a full-scale investigation into allegations of serious misconduct by its probationary officer. Likewise, the Court will not second-guess Ricciardi's and Goldstein's decisions not to interview every witness calling in on Perez's behalf, especially in light of the fact that Goldstein's investigation report recites telephone calls from four of Perez's witnesses.

was the employer's "'standard operating procedure--the regular rather than the unusual practice.'" *Id*; *see also Berry v. Jacobs IMC, LLC*, 99 Fed. Appx. 405, *410 (3d Cir. May 27, 2004 ) (same).  Here, Rabadeu's and Robson's testimonies at most evidence isolated discriminatory or retaliatory acts.  Rabadeu's and Robson's disputes with Bober are personal and complex.  These do not evidence that discrimination was the "standard operating procedure" under Bober's management.

In her deposition, Rabadeu testified that Bober sued her for age discrimination at the time that she was the Chief of Police at NJTPD and he was her subordinate.  *See* Rabadeau Dep. at 28-30, attached as Ex. H to Plaintiffs' Brief.  She was subsequently forced by her supervisors to make Bober a deputy chief and to settle the lawsuit that he filed against her.  *Id.* at 29.  She was told that if she didn't comply, she would be terminated.  *Id.*  Rabadeau refused to comply, stating that Bober would not make a good deputy chief because he engaged in discrimination against women and minorities.  The lawsuit was settled in Bober's favor and Bober was made the deputy chief in spite of her protest.  *Id.* at 29-30.

Robson alleged in his deposition testimony that he and Bober had a long-time feud that caused Bober to retaliate against him.  Robson was employed as a NJTPD officer during Rabadeau and Bober's tenures as chiefs.  *Id.* at 10.  Robson alleges that he consistently questioned Bober's "totalitarian" leadership style.  *Id.* at 11.  Robson also drafted a consensus report criticizing Bober.  *Id.* at 20-24.  Robson alleges that Bober retaliated against him by initiating an Internal Affairs investigation into his car accident and terminating him.  *Id.* at 11, 27.  He also generally alleges that Bober created a retaliatory environment where any employee who stood up to him suffered his wrath.  *Id.* at 18-27.  Robson is in the process of challenging his

termination before PERC.  *Id*. at 28.

In contrast to Plaintiffs' allegations, evidence in the record indicates that discrimination was not NJTPD's "standard operating procedure": it is uncontested that the other Hispanic officers who started their probationary period around the same time as Perez are now permanent officers, Perez admits that he did not experience disparate treatment until the commencement of the investigation and the only evidence of discrimination that Perez specifically alleged was the offhand racist comment allegedly made by Bober.  .

### E.      Emotional Distress and Loss of Consortium

#### 1.      The Parties' Arguments

Defendants argue that Perez's State tort claims, including intentional infliction of emotional distress, are barred by the Tort Claims Act, *N.J. Stat. Ann*. §59:9-2(d), which prohibits courts from awarding damages against a public entity or public employee for pain and suffering resulting from any injury.  (Defendants' Brief at 35).  Defendants argue that because Diana Perez's loss of consortium claim is derivative of her husband's tort claims, it is also barred by Section 59:9-2(d).  *Id.*  Defendants also argue that Plaintiffs failed to support their intentional infliction of emotional distress claim with evidence that Defendants' conduct was extreme and outrageous.  *Id.* at 36.  (See case at 36).

Plaintiffs argue that they are eligible for pain and suffering damages because Herman Perez has suffered a permanent psychological and emotional injury.  (Plaintiffs' Brief at 37-38). Plaintiffs argue that he has suffered and continues to suffer from anxiety, difficulty sleeping, chest pain and pressure, loss of self-esteem and depression.  *Id.*  As evidence, Perez has proffered

one psychological report.  (Plaintiffs' Brief Ex. A).  The report states that Perez's examiner

diagnosed him with mixed anxiety and depression, and concluded that his symptoms "may be

permanent."  *Id.* at 7-8.  Plaintiffs also argue that their claims meet Section 59:9-2(d)'s monetary

threshold because Perez has sought extensive psychological treatment totaling over $3600.

(Perez Aff. ¶¶ 22-23).   Plaintiffs did not address Defendants' argument regarding the

insufficiency of their intentional infliction of emotional distress claim.


### 2.      Applicable Law

Section 59:9-2(d) governs a public entity's liability for pain and suffering damages.

*Knowles v. Mantua Township Soccer Assoc.*, 176 N.J. 324, 329 (2003).  It provides:

> No damages shall be awarded against a public entity or public
> employee for pain and suffering resulting from any injury; provided,
> however, that this limitation on the recovery of damages for pain and
> suffering shall not apply in cases of permanent loss of a bodily
> function, permanent disfigurement or dismemberment where the
> medical treatment expenses are in excess of $ 3,600.00. For purposes
> of this section medical treatment expenses are defined as the
> reasonable value of services rendered for necessary surgical, medical
> and dental treatment of the claimant for such injury, sickness or
> disease, including prosthetic devices and ambulance, hospital or
> professional nursing service.

The New Jersey Supreme Court has established a two-prong test that a plaintiff must

satisfy to become eligible for an award of pain and suffering damages.  *Knowles*, 176 N.J. at 329.

"A plaintiff must show '(1) an objective permanent injury, and (2) a permanent loss of a bodily

function that is substantial.'" *Id.*  (quoting *Gilhooley v. County of Union*, 164 N.J. 533, 540-41

(2000)).  To defeat a summary judgment motion, a plaintiff can satisfy the first prong by offering

documents from medical professionals stating that he has suffered a permanent injury.  With

respect to the second prong, "there is no *per se* rule that would be decisive in all cases . . ..
Rather, 'it is the nature or degree of the ongoing impairment that determine whether a specific
injury meets the threshold requirement.'" *Id.* at 331 (quoting *Ponte v. Overeem*, 171 N.J. 46, 53
(2002)).  However, "there must be a 'physical manifestation of [a] claim that [an] injury . . . is
permanent and substantial."  *Id.* at 332 (quoting *Ponte*, 171 N.J. at 54).  An injury that merely
causes pain that interferes with a plaintiff's ability to perform certain activities is insufficient.  *Id.*
A plaintiff cannot recover for "'subjective feelings of discomfort.'" *Id.* (quoting *Gilhooley*, 164
N.J. at 540).

Also, it is well-established that a spouse's loss of consortium damages are derivative of
the injured spouse's direct tort claim and that "'deficiencies in the physically-injured spouse's
evidence in a tort action apply with equal vigor to the other spouse's loss of consortium claims.'"
*Warnick v. NMC-Wollard, Inc*., 2007 WL 1007973, *3 (W.D. Pa. March 30, 2007) (quoting
*Urmann v. Rockwood Cas. Ins. Co.*, 905 A.2d 513, 522 (Pa. Super. 2006); *see also Oliver v.
Raymark Indus., Inc*., 799 F.2d 95 (3d Cir. 1986).

Finally, to plead a prima facie claim for intentional infliction of emotional distress under
New Jersey law, a plaintiff must allege "(1) that the defendant acted intentionally or recklessly;
(2) that the defendant's conduct was extreme and outrageous; (3) the defendant's action was the
proximate cause of the plaintiff's emotional distress; and (4) that the plaintiff's distress was so
severe that no reasonable person would be expected to endure it."  *Rosenberg v. JCA Assocs.,
Inc.*, 2007 WL 1038893, *17 (D.N.J. March 30, 2007) (citing *Buckley v. Trenton Sav. Fund
Soc'y*, 11 N.J. 355, 369 (1988)).

### 3.   Herman Perez's Tort Claims and Diana Perez's Loss of Consortium Claim are Subject to Dismissal

Herman Perez's claims do not meet Section 59:9-2(d)'s requirements for an award of pain and suffering damages.  Perez failed to establish a genuine issue that he has suffered "an objective permanent injury."  His only evidence consists of one psychological report that merely states that his symptoms of anxiety and depression "may be permanent."  This evidence is too attenuated to meet Section 59:9-2(d)'s strict standard.

Second, Plaintiffs have not established a genuine issue that Defendants' conduct was extreme and outrageous; therefore, their intentional infliction of emotional distress claim is subject to dismissal.   In fact, as explained in pages 14-16 *supra*, Plaintiffs have not even met the lesser burden of establishing a genuine issue that Defendants acted unreasonably in terminating Perez, that the investigation process was unreasonable, or that Perez was subjected to discrimination because of his speech and affiliation with the HLEA.

Finally, because Herman Perez's tort claims are subject to dismissal, Diana Perez's loss of consortium claim is necessarily subject to dismissal also.

### III.   CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment is granted and all claims against Defendants' are hereby dismissed with prejudice.  An appropriate form of order is filed herewith.

Dated: August 20, 2007

                                   s/ Garrett E. Brown, Jr.
                                  GARRETT E. BROWN, JR., U.S.D.J.